UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- against -

HAIRO CONTRERAS,

Defendant.

**MEMORANDUM
OPINION & ORDER**

22 Cr. 129 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

The Indictment charges Defendant Hairo Contreras with illegal reentry in

violation of 8 U.S.C. §§ 1326(a) and (b)(2).  (Indictment (Dkt. No. 6))  Defendant has moved to

dismiss, arguing that (1) his prior deportation was invalid; and (2) Section 1326 violates the

equal protection guarantee of the Fifth Amendment.  (Def. Mot. (Dkt. No. 18); Def. Br. (Dkt.

No. 19))

For the reasons stated below, Defendant's motion to dismiss will be denied.

**BACKGROUND**

I. **FACTS**[1]

A. **Defendant's Early Life and Family in the Dominican Republic**

Defendant is 36 years old.  He was born in La Vega in the Dominican Republic in

1986 and lived there until age 23.  (Feb. 23, 2023 Tr. (Dkt. No. 40) at 7; Contreras Decl. (Dkt.

---

[1]  The Court's factual account is premised on the Defendant's testimony at the February 23, 2023
evidentiary hearing, the exhibits received in evidence at that hearing and submitted with the
parties' motion papers, and the "well-pleaded allegations" in the Indictment, which are "taken as
true . . . [f]or purposes of evaluating a motion to dismiss."  United States v. Eichman, 756 F.
Supp. 143, 145 (S.D.N.Y. 1991).

No. 20-1) ¶¶ 2-3)[2]  Defendant was raised by his mother, with whom he is close.  (Feb. 23, 2023

Tr. (Dkt. No. 40) at 7-8)  Defendant's "family's financial situation growing up" was "[n]ot

good," and he "began working with [his] uncle as a car mechanic" at age eight.  (Id. at 8)

Defendant has three children, evidently with two women, in the Dominican

Republic.  (Id. at 9)

### B.    Defendant's Entry into the United States and Life in the United States

When Defendant was about 13 years old, his mother moved from the Dominican

Republic to the United States.  His brother and most of his father's relatives likewise moved to

the United States.  (Id. at 8-9)

In 2009 – at age 23 – Defendant illegally entered the United States.  (Id. at 9-10

("Q.  How old were you when you came to the United States?  A.  23.  Q.  And you mentioned

that was in 2009, right?  A.  Yes."); Oct. 3, 2018 Removal Proceeding Audio, DX-L[3] (Dkt. No.

47-11) at 4:29 ("Immigration Judge:  Did you illegally enter the United States?  Contreras:  Yes,

sir."))  Contreras came to the United States because he was "looking to provide better food and

education for [his] children."  (Feb. 23, 2023 Tr. (Dkt. No. 40) at 10)[4]

After coming to the United States, Defendant lived with his mother and a cousin

in the Bronx.  He frequently saw his brother, who lived in Manhattan.  His sister later moved to

the United States as well.  According to Contreras, he had a close relationship with his relatives

---

[2]  The page numbers of documents referenced in this Order correspond to the page numbers
designated by this District's Electronic Case Files ("ECF") system.

[3]  "DX" refers to defense exhibits received during the February 23, 2023 hearing, and "GX"
refers to Government exhibits received at that hearing.

[4]  At the evidentiary hearing, Defendant testified that he does not read, write, or speak English.
(Feb. 23, 2023 Tr. (Dkt. No. 40) at 7)

in the New York area.  (Id. at 10-11)  The Defendant's children, their mothers, and the Defendant's father remained in the Dominican Republic, however.  (Id. at 9)

After arriving in the United States, Contreras quickly found work as a car mechanic, which paid better than his work in the Dominican Republic.  Contreras enjoyed his work and sent his earnings to his children in the Dominican Republic.  (Id. at 11-12)  He later worked as a porter.  (Id. at 27)

In 2010, Defendant met and began dating a woman in New York City.  They moved in together in 2011 and were married in 2013.  They have two children together, ages two and eight, both of whom were born in New York.  Contreras was actively involved in raising his oldest child, who needed surgery and specialized medical care as an infant.  (Id. at 12-18; May 2, 2013 Marriage Certificate, DX-N (Dkt. No. 47-13); Birth Certificates, DX-O, -P (Dkt. Nos. 47-14, 47-15))

### C.  **Defendant's Pre-2017 Criminal History**

In November 2012, Defendant was arrested and charged with burglary, theft, and attempted burglary in New Jersey state court.  (Feb. 23, 2023 Tr. (Dkt. No. 40) at 18; N.J. Criminal History, GX-3 (Dkt. No. 47-22) at 3)  His defense attorney referred him to an immigration lawyer, Ronald Mondello.  (Feb. 23, 2023 Tr. (Dkt. No. 40) at 18)  Mondello advised that "a guilty plea to the burglary, attempted burglary or theft offense with a one-year jail sentence would result in Mr. Contreras being deported," and he recommended that Contreras seek to plead to a lesser charge.  (July 19, 2013 Mondello Ltr., DX-J (Dkt. No. 47-9) at 3; Feb. 23, 2023 Tr. (Dkt. No. 40) at 19)  In October 2013, Contreras pleaded guilty to criminal trespass. He received no prison sentence and paid the fine that was imposed.  (N.J. Criminal History, GX-3 (Dkt. No. 47-22) at 3)

In November 2014, Contreras was arrested and charged with criminal possession of a controlled substance with intent to sell in New York state court.  He pleaded guilty in June 2015.  His plea and sentence were vacated in September 2016, after he participated in a diversion program.  (N.Y. Criminal History, GX-2 (Dkt. No. 47-21) at 7-8; Feb. 23, 2023 Tr. (Dkt. No. 40) at 19-20, 59)

### D.      Defendant's U-Visa Application and Discussion of Spousal Petition

In 2016, Contreras was assaulted by two men, who "hit [him] on the back of the head with a gun and . . . broke open [his] head and [his] nose."  (Feb. 23, 2023 Tr. (Dkt. No. 40) at 20; Injury Photo, DX-H (Dkt. No. 47-8); Contreras Decl. (Dkt. No. 20-1) ¶ 7)  Defendant reported the attack and "cooperated with the prosecutors in [the] case" from the Bronx County District Attorney's Office.  (Feb. 23, 2023 Tr. (Dkt. No. 40) at 21)  The prosecutors told him that he might be eligible for a "U-visa" (id.), a type of visa that "provide[s] a . . . temporary immigration benefit . . . in exchange for law enforcement assistance."  Moya v. United States Dep't of Homeland Sec., 975 F.3d 120, 142 n.5 (2d Cir. 2020) (Carney, J., concurring in part).

Contreras spoke with Attorney Mondello about the U-visa application, and Mondello wrote a letter to the Bronx District Attorney's Office in support of Defendant's visa application.  (Feb. 23, 2023 Tr. (Dkt. No. 40) at 21; May 4, 2017 Bronx D.A. Ltr., DX-C (Dkt. No. 47-3))  Contreras testified that Mondello and the prosecutors told him that the U-visa could not be issued "[u]ntil the [assault] case was closed."  (Feb. 23, 2023 Tr. (Dkt. No. 40) at 21)

At some point between 2014 and 2017, Contreras and Mondello also discussed the possibility of filing a "spousal petition" for legal residency.  No such petition was ever filed, however (see id. at 20), and Contreras never obtained legal residency.  (Id. at 47 ("THE COURT: [Y]ou weren't a legal resident [in 2018], right?  A legal resident of the United States?  THE WITNESS: No.")

###### E.     Defendant's 2018 New York State Conviction and Related Immigration Advice

In November 2017, while Contreras's U-visa application was still pending, he was arrested in the Bronx and charged in New York state court with criminal sale of a controlled substance in the second degree, in violation of New York Penal Law § 220.41(1), a Class A-II felony.  (Id. at 22; N.Y. Criminal History, GX-2 (Dkt. No. 47-21) at 4)  The controlled substance was cocaine.  (Feb. 14, 2018 N.Y. State Plea Tr., DX-K (Dkt. No. 47-10) at 12)  He was detained at Rikers Island after his arrest.  (Feb. 23, 2023 Tr. (Dkt. No. 40) at 22)

Defendant retained criminal defense attorney Gary Kaufman to represent him in the New York state case.  (Id. at 22, 34-35; Feb. 14, 2018 N.Y. State Plea Tr., DX-K (Dkt. No. 47-10) at 3)  Contreras testified that Kaufman told him that – as a result of the drug trafficking arrest – he "had no possibility whatsoever to remain in the United States."  (Id. at 23)

In December 2017, Defendant's wife contacted immigration attorney Mondello's law firm and spoke with associate Pablo Forray.  In an email to Mondello summarizing the call, Forray states:  "I told her that a drug charge would complicate his U-visa petition, but that we couldn't tell until we knew more.  I also told her that he needs to consult with an immigration attorney like us before pleading to anything."  (Dec. 13, 2017 Forray Email, DX-A (Dkt. No. 47-1) at 2)  In response to Forray's email, Mondello states that because (1) the Bronx District Attorney's Office had not provided an update for ten months; (2) Contreras had paid only $500; and (3) Contreras had never obtained from the Bronx District Attorney's Office the affidavit necessary for obtaining the U-visa, Mondello's firm was "done with this case . . . .  Case over. Close it."  (Dec. 13, 2017 Mondello Email, DX-A (Dkt. No. 47-1) at 2)  Forray's time sheets indicate, however, that he performed legal research later that month regarding whether Contreras

– if convicted of the pending drug charge – could still obtain a U-visa after serving his sentence. (Forray Time Sheets, DX-B (Dkt. No. 47-2) at 2)

Contreras testified that his wife – after consulting Forray – told Contreras that he "had no . . . chances whatsoever anymore" with respect to his U-visa application.  He further testified that she did not tell him that Forray had advised her to tell Contreras to consult with an immigration attorney before pleading guilty.  (Feb. 23, 2023 Tr. (Dkt. No. 40) at 23, 51)

On February 14, 2018, Contreras pleaded guilty to criminal sale of a controlled substance in the second degree, a Class A-II felony, in Bronx County Supreme Court.  During his plea allocution, the following colloquy took place:

> Q. So, sir, do you understand if you're not a United States citizen this plea of guilty would result in your being deported, excluded from the United States.  Do you understand that?
>
> A. Yes.
>
> Q. Have you talked to your lawyer about that?  He indicated that you have.  I believe that's true.  I just want you to confirm that.
>
> A. Yes.
>
> Q. You discussed the immigration consequences of pleading guilty today?
>
> A. Yes.
>
> Q. Are there any questions about that issue and do you want to talk to your lawyer about it now?
>
> A. No, no.

(Feb. 14, 2018 N.Y. State Plea Tr., DX-K (Dkt. No. 47-10) at 11-12)

Contreras did not "ask the judge whether [he] [w]ould ever be able to come back to the United States legally," nor did the judge <u>sua</u> <u>sponte</u> address that issue.  (Feb. 23, 2023 Tr. (Dkt. No. 40) at 25-26)

6

Nothing in the record suggests that – prior to his guilty plea – (1) Contreras or anyone acting on his behalf ever asked Kaufman, Mondello, or another lawyer about his prospects for eventually returning to the United States legally; or (2) Kaufman, Mondello, or another lawyer provided advice or an opinion concerning this issue.  (Id. at 35 ("Q. . . . [W]hat, if anything, did [Kaufman] tell you about your ability to come back to the United States legally? A. . . . [H]e never said anything to me."))

Pursuant to his plea agreement, Contreras was sentenced to three years' imprisonment and five years' supervised release.  Judgment was entered on March 14, 2018. Defendant's release date was set as November 13, 2020, with a conditional release date of June 7, 2020 for good behavior.[5]  (Feb. 14, 2018 N.Y. State Plea Tr., DX-K (Dkt. No. 47-10) at 3, 13; N.Y. Criminal History, GX-2 (Dkt. No. 47-21) at 5)

## F.   **Defendant's Pursuit of Deportation**

While Contreras was detained at Rikers Island, "some of [his fellow inmates] told [him] about" a New York State program known as Early Conditional Parole for Deportation Only (the "Early Parole Program").  (Feb. 23, 2023 Tr. (Dkt. No. 40) at 28)  Pursuant to the Early Parole Program, when an inmate (1) has been convicted of an offense other than an A-I felony or a violent felony; (2) is subject to deportation by U.S. Immigration and Customs Enforcement ("ICE"); and (3) "has had a final order of deportation issued against him or her," N.Y. Exec. L. § 259-i(2)(d)(i), then

---

[5]  Contreras testified that his conditional release date was January 1, 2020 (Feb. 23, 2023 Tr. (Dkt. No. 40) at 54), but the record does not support his claim.  June 7, 2020 is the date that appears on his rap sheet and in the U.S. Immigration and Customs Enforcement Notice to Appear.  (N.Y. Criminal History, GX-2 (Dkt. No. 47-21) at 5; Aug. 2, 2018 Notice to Appear (Dkt. No. 20-3) at 2)  The Court concludes that June 7, 2020 was the Defendant's conditional release date.

the [New York State] Parole Board "may consider, as a factor warranting earlier release, the fact that such inmate will be deported, and may grant parole to such inmate conditioned specifically on his prompt deportation."

[An Early Parole order] is not to be issued unless the Parole Board has received assurance from [ICE] that (i) upon the inmate's release from state custody, "an order of deportation will be executed" or deportation proceedings "will promptly be commenced" and (ii) the inmate will not be released from [ICE] custody, except as a result of his deportation, "without providing the board a reasonable opportunity to arrange for execution of its warrant for the retaking of such parolee."

An inmate who is granted [an Early Parole order] is not released to parole supervision; rather, he is to be "delivered to the custody" of [ICE]. In practice, according to the New York State Division of Parole, there is no [ICE] holding facility to which inmates . . . are delivered upon the issuance of a [an Early Parole order]. Instead, once the Division of Parole informs [ICE] that an inmate is available to be transferred into [ICE] custody, "it is . . . the responsibility of [ICE] to come to the facility" and take the inmate into custody.

Duamutef v. I.N.S. ("Duamutef II"), 386 F.3d 172, 175 (2d Cir. 2004) (quoting N.Y. Exec. L. § 259-i(2)(d)(i)-(ii)) (formatting altered).

Accordingly, for an inmate such as Contreras who is subject to deportation and has been convicted of a non-violent A-II felony, the Early Parole Program offers immediate release from New York State prison once ICE has issued a final order of removal. The prison releases the inmate into ICE custody, and the individual is then deported.

The Federal immigration laws do not address the consequences of participation in the Early Parole Program, which is a New York State program. Because the Early Parole Program culminates in deportation pursuant to an order issued after a removal proceeding, however, participants in the Early Parole Program are inadmissible for at least ten years. See 8 U.S.C. § 1182(a)(9)(A)(ii)(I) ("Any alien . . . who has been ordered removed [at a removal proceeding] . . . and who seeks admission within 10 years of the date of such alien's departure or removal . . . is inadmissible."). As discussed below, Contreras testified that he was told by other inmates that, if he participated in the Early Parole Program, "[he] would never be able to return

to the United States." Contreras further testified that "the lawyers that [his] wife went to check with . . . told her that." (Feb. 23, 2023 Tr. (Dkt. No. 40) at 31-32)

On April 6, 2018 – after his sentencing – Contreras was transferred from Rikers Island to Ulster Correctional Facility, a New York State prison. (N.Y. Criminal History, GX-2 (Dkt. No. 47-21) at 5)

On April 13, 2018 – one week after arriving at Ulster – Contreras was interviewed by an ICE officer. The ICE officer questioned Contreras and recorded his answers on a document entitled "Affidavit in an Administrative Proceeding." Contreras signed and initialed his affidavit at the conclusion of the interview. (Apr. 13, 2018 ICE Affidavit, DX-Q (Dkt. No. 47-16); Apr. 23, 2023 Tr. (Dkt. No. 40) at 26) Although Contreras testified that he did not read the affidavit before he signed and initialed it, the interview was conducted in Spanish, and Contreras has not disputed the accuracy of his affidavit. (Apr. 23, 2023 Tr. (Dkt. No. 40) at 26-27)

Contreras's affidavit reflects, inter alia, the following questions and answers:

Q: What was the date, place, and manner of your last entry into the United States?

A: I last entered the U.S. illegally [i]n or about March or April 2009 through [the] Texas border.

Q: What is your current immigration status?

A: Illegal alien.

Q: How did you obtain that status?

A: I entered the U.S. without authorization.

. . . .

Q: Do you have any fear of persecution or torture should you be removed from the United States?

A: No.

. . . .

Q:  Did you understand all the questions?

A:  Yes.

Q:  Is there anything else you want to add to this statement?

A:  I wish to be deported from the U.S. as soon as possible.

(Apr. 13, 2018 ICE Affidavit, DX-Q (Dkt. No. 47-16) at 3, 6)

As to Contreras's desire to be immediately deported, at the evidentiary hearing

Contreras testified that he volunteered to the ICE officer that he wanted to be deported as soon as

possible.  His statement was not in response to any questioning from the ICE officer.  (Feb. 23,

2023 Tr. (Dkt. No. 40) at 27-28 ("Q. Now, did the ICE officer ask you about deportation?  A.

No.  Q. Do you remember telling him that you wanted to be deported?  A. Yes."))

Contreras was later transferred from Ulster Correctional Facility to Greene

Correctional Facility.  After arriving at Greene, Contreras asked a counselor about the Early

Parole Program.  The counselor told Contreras "that with early deportation, [he] would serve less

time."  (Id. at 28-29)

On August 2, 2018, ICE issued a Notice to Appear that required Contreras to

appear at an October 3, 2018 removal proceeding.  (Aug. 2, 2018 Notice to Appear (Dkt. No. 20-

3) at 2)

"Mr. Baez" – a long-time inmate who worked in the library at Greene, and who

provided immigration advice to Contreras – "advised [him] to write [a] letter [to ICE] so that

[he] could get the benefit of [the Early Parole Program]."  Baez wrote the letter, which Contreras

signed.  (Feb. 23, 2023 Tr. (Dkt. No. 40) at 37, 46, 53)  The letter is notarized and is dated

August 18, 2018, and reads as follows:

Dear Sir/Madam:

Please take notice that I presently stand convicted of Conspiracy of Criminal Sale of [a] Controlled Substance in the First Degree, a Class A felony, which make[s] me eligible for removal from this country, immediately upon being parole[d] or completion of my sentence.  Thereby, I want to wa[i]ve all of my right[s] to a deportation hearing [and] appeal and have my removal order issue[d] against me as soon as possible.

Wherefore, the present letter is to let you [know] that I am presently seeking from your agency to start the removal order proceeding, so that I can be granted an order for Early Conditional Parole for Deportation Only (ECPDO) from the New York State Department of Correction and Community Supervision, which I need in order to be granted ECPDO.

(Aug. 18, 2018 Contreras Ltr., DX-S (Dkt. No. 47-17) at 2)[6]

When asked at the evidentiary hearing if "any lawyer ever sp[oke] to [him] about [his] ability to come back to the United States legally" after participating in the Early Parole Program, Contreras answered, "No."  (Feb. 23, 2023 Tr. (Dkt. No. 40) at 35)  Consistent with this testimony, there is no evidence in the record suggesting that Contreras ever asked a lawyer whether he could lawfully return to the United States after his deportation.  Contreras testified, however, that his wife told him that she had asked certain unidentified "immigration lawyers" about this issue, and that she conveyed their thoughts to him:

Q. While you were incarcerated, was your wife speaking to immigration lawyers about your case?

A. Yes.

Q. And what information was she telling you she had learned from those immigration lawyers?

A. She said that the lawyers were telling her that I was not going to be able to return to the United States legally.

_____

[6]  Although the letter reports that Contreras was convicted of "Conspiracy of Criminal Sale of [a] Controlled Substance in the First Degree," as discussed above, Contreras was convicted of criminal sale of a controlled substance in the second degree.  (N.Y. Criminal History, GX-2 (Dkt. No. 27-21) at 4)

Q. And was that the basis for your understanding that you would not be able to come back to the United States no matter what?

A. Yes.

(Id. at 36; see id. at 32 ("[T]he lawyers that my wife went to check with, they told her that.")

Neither Defendant's wife nor the immigration lawyers she purportedly consulted testified at the evidentiary hearing, however.[7]  And the parties stipulated that Mondello and his associate Forray, if called as witnesses, "would testify that [they did] not recall having any additional discussions with the defendant or his family members [after the December 2017 phone call discussed above]."  (Mondello Stip., DX-U (Dkt. No. 47-19) ¶¶ 4(g), 5-6)  To the extent that Defendant's wife discussed with certain unidentified immigration lawyers whether he could lawfully return to the United States after his deportation, there is no evidence that he asked her to do so, or that Contreras himself ever sought advice from an immigration attorney as to whether he could lawfully return to the United States after his deportation.

Contreras testified, however, that his "understanding of the impact of [his participation in the Early Parole Program] on [his] ability to come back to the United States legally" was that "he would never be able to return to the United States."  (Feb. 23, 2023 Tr. (Dkt. No. 40) at 31)  This understanding was based on information provided by (1) his wife, who had spoken with unidentified lawyers about this issue; and (2) Baez and other inmates at Greene Correctional Facility "telling [him] that after [he] was deported, [he] could never come back to the United States legally."  (Id. at 31-32, 36)

---

[7]  Defense counsel obtained an adjournment of the evidentiary hearing on the basis that the Defendant's wife was attending to a sick family member.  In the adjournment request, defense counsel stated that the wife would testify at the hearing and described her as an "indispensable witness[]."  (Jan. 18, 2023 Def. Ltr. (Dkt. No. 34) at 1; Jan. 18, 2023 Order (Dkt. No. 35) at 1) Although the wife appeared to be waiting outside the courtroom on the adjourned date of the hearing, she was not called to testify.

At the evidentiary hearing, the Court questioned Contreras about why he decided to pursue the Early Parole Program even after being told that – if he participated in that program – he would never be permitted to reenter the United States:

> THE COURT:  And even after you learned that if you participated in the [E]arly [Parole] [P]rogram you would never be allowed to return to the United States, you were still interested in participating in the [E]arly [Parole] [P]rogram[?]
>
> THE WITNESS:  At that time that was all I was interested in because that was the only option that I had.
>
> . . . .
>
> THE COURT:  And why was it that you were still interested in the [E]arly [Parole] [P]rogram even after you were told that if you participated in that program, you could never come back to the United States?
>
> THE WITNESS:  Because as I understood it, that was the only option I had at the time.
>
> THE COURT:  I don't understand what you're saying.  What I'm trying to understand is, you told us that you were told that if you took advantage of this [E]arly [Parole] [P]rogram, you could never return to the United States.  And you've also told us that even after you learned that, you were still interested in the program.  And I'm trying to understand why you were still interested in the program even after being told that.
>
> THE WITNESS:  Because they explained to me that whether I was in the early deportation or not, no matter what, I was going to be deported.
>
> THE COURT:  No, you've said that a number of times, that you understood that you were going to be deported.  You told us, no matter what.  I understand that.  But isn't it a fact that you remained interested in the [E]arly [Parole] [P]rogram, even after you were told you'd never be able to come back to the United States if you participated in the program, because you would get out of the three-year prison sentence?
>
> THE WITNESS:  Yes, that's right.  But I remained interested because if I served my whole sentence or got out early, it was all going to be the same for me; I'd never be able to return.
>
> THE COURT:  And this program offered you a way that you could avoid serving those three years in prison, didn't it?
>
> THE WITNESS: Yes.

(<u>Id.</u> at 32-34)

### G.    **Defendant's Removal Proceeding**

Defendant's removal hearing was conducted by video conference on October 3, 2018.  The proceedings were translated into Spanish for Contreras, who appeared <u>pro se</u>.  (Oct. 3, 2018 Removal Proceeding Audio, DX-L (Dkt. No. 47-11))

At the hearing, the immigration judge told Contreras that he had "the right to an attorney at [his] own expense . . . the right to president evidence to the court and to challenge the evidence against [him] . . . the right to question any witnesses that appear in court . . . [and] the right to appeal whatever decision [the immigration judge] issue[d] in [his] case."  (<u>Id.</u> at 2:20, 2:50)  After Contreras confirmed that he "underst[ood] these rights," the immigration judge asked him if he "would like time to get an attorney."  Contreras replied, "No, I want to be deported.  I don't want to fight my case."  (<u>Id.</u> at 3:17)

The immigration judge then swore in Contreras.  Contreras stated his name, that he was a citizen of the Dominican Republic, and that he wished to be deported to his country.  He further testified that he had no fear of going back to the Dominican Republic; that he had illegally entered the United States; that he had never received permission to be in the United States; that he understood that reentering the United States after having been deported was a Federal offense; that he had been convicted in March 2018 of selling cocaine; that he had been sentenced to three years' imprisonment; and that he had not appealed his conviction.  (<u>Id.</u> at 3:35)  The immigration judge then found "that [Contreras was] removable from the United States by clear and convincing evidence," and that "as [Contreras was] requesting, [the immigration judge] would order [him] removed from the United States to the Dominican Republic."  (<u>Id.</u> at 5:49)  Contreras said that he understood the judge's findings and ruling.  The immigration judge

then asked:  "Do you accept your decision as final, or do you want to appeal it?"  Contreras

replied, "No, I want to be deported to my country."  (Id. at 6:20)

     The immigration judge asked Contreras if he had "any questions."  Contreras

thanked the immigration judge for holding a prompt hearing.  He then asked:  "Okay, so now it's

final, final, my deportation order?"  The immigration judge answered "Yes."  (Id. at 6:37)  The

immigration judge issued a final order of removal later that day.  (Oct. 3, 2018 Removal Order

(Dkt. No. 23-3))

     At the evidentiary hearing in the instant case, Contreras testified that he had

waived his right to appeal the order of removal to the Board of Immigration Appeals ("BIA")

because his goal at that time was to be released from prison and deported.  He had "no reason

. . . to appeal the immigration judge's order because [the immigration judge] had done what

[Contreras had] asked him to do."  (Feb. 23, 2023 Tr. (Dkt. No. 40) at 38-39)

### H.   Voluntary Departure

     At Contreras's removal hearing, the immigration judge did not advise Contreras

of a type of relief from deportation known as "voluntary departure."  See 8 U.S.C. § 1229c.

> [V]oluntary departure offers an alien several benefits.  First, an alien who is
> granted voluntary departure may be able to avoid "extended detention pending
> completion of travel arrangements." . . . Second, the alien may choose his
> departure date.  Third, in some cases, voluntary departure "facilitates the
> possibility of readmission" because an alien who voluntarily departs may
> "sidestep some of the penalties attendant to deportation," including, for example,
> those providing that an alien who is deported would not be eligible for
> readmission until a certain amount of time has elapsed.  And lastly, unlike an
> alien who is deported, an alien who returns to the United States without
> permission after being granted voluntary departure would not be subject to
> criminal prosecution for illegal reentry pursuant to Title 8, United States Code,
> Section 1326(a).

United States v. Gonzalez, No. 15-CR-0021 JMF, 2015 WL 3443942, at *2 (S.D.N.Y. May 29,

2015) (quoting Dada v. Mukasey, 554 U.S. 1, 11 (2008) (further citations omitted)).  Where an

alien is eligible for voluntary departure, an immigration judge has discretion to grant or deny a request for voluntary departure.  See Carcamo v. U.S. Dep't of Just., 498 F.3d 94, 96-97 (2d Cir. 2007); Dada, 554 U.S. at 8.

While the record does not reveal why the immigration judge did not advise Contreras of that type of relief, the immigration judge likely understood that Contreras's March 2018 New York State conviction for selling cocaine was an "aggravated felony" that made Contreras ineligible for voluntary departure.  See United States v. Gutierrez-Campos, No. 21 CR. 40 (JPC), 2022 WL 281582, at *12-13 (S.D.N.Y. Jan. 31, 2022); 8 U.S.C. §§ 1101(a)(43)(B), 1227(a)(2)(A)(iii), and 1229c(a)(1) (providing that an alien convicted of "illicit trafficking in a controlled substance" is "deportable" for having been "convicted of an aggravated felony" and is therefore not eligible for voluntary departure); 21 U.S.C. § 802(6) and 21 C.F.R. § 1308.12(b)(4) (providing that the term "controlled substance" includes cocaine as defined under federal law).

At the evidentiary hearing, Contreras testified that he first learned about "voluntary departure" years after his removal hearing, from his lawyer in the instant case.  (Feb. 23, 2023 Tr. (Dkt. No. 40) at 40)  During his direct examination, Contreras stated that – had he known about voluntary departure and been informed that he was eligible for that program – he would have pursued it, even if doing so would have precluded him from participating in the Early Parole Program:

> Q. Mr. Contreras, if you had been told back in 2018 that voluntary departure meant that you would potentially be able to come back to the United States legally one day, would you have pursued that as an option?
>
> A. Yes.
>
> Q. Even though you would have had to serve your entire prison sentence?
>
> A. Yes.

Q. And even though you would have had to go back to the Dominican Republic anyway?

A. Yes.

Q. And even if you had been told that there was no guarantee you could come back to the United States legally?

A. Yes.

Q. Why would you have pursued that option instead of early conditional deportation?

A. Because with that option of voluntary deportation, that would be the hope of one day being able to come back to the United States, legally.

Q. Why was that important to you?

A. Because here I can offer a better way of life to my children, my wife, my family, and because this is the safest country.

(Feb. 23, 2023 Tr. (Dkt. No. 40) at 44-45)

On cross-examination, the Government asked Contreras whether he would have pursued voluntary departure – and chosen to serve his three-year sentence – if he had been told that it was unlikely he would be admitted to the voluntary departure program:

Q. Mr. Contreras, if you were told in 2018 that it was unlikely you would receive voluntary departure, would you have chosen to serve your entire three-year sentence?

A. Correct.

Q. That's a yes, you would have served your entire three-year sentence?

A. What you are saying is – could you repeat the question[?]

Q. Sure.  If you had been told in 2018 that it was unlikely that you would receive voluntary departure, would you have dropped your request for early parole or deportation and chosen to serve your whole sentence?

A. No, I would have kept looking for deportation.

(Feb. 23, 2023 Tr. (Dkt. No. 40) at 60-61)[8]

    **I.**       **Defendant's Remaining Time in Custody and Deportation**

        On June 11, 2019, the New York State Parole Board issued an order granting

Defendant Early Conditional Parole for Deportation Only.  The order set a release date of

October 2, 2019.  (June 11, 2019 Parole Order, GX-1 (Dkt. No. 47-20) at 2)

        In an August 28, 2019 letter to ICE, however, Contreras complained that he had

not yet been deported:

> The reason I am addressing myself [to you] is to inquire about my deportation.
> My case of [Early Conditional Parole for Deportation Only] was granted on
> 6/11/19.  I have . . . heard nothing else.
>
> My question is if my [Early Conditional Parole for Deportation Only] was granted
> and effected on 6/11/19, why am I still in prison instead of being in . . . federal
> lock-up to await this deportation.  [Enclosed] is a copy of my [order granting
> Early Conditional Parole for Deportation Only]. . . . Thank you for your time and
> consideration.

(Aug. 28, 2019 Contreras Ltr., DX-T (Dkt. No. 47-18) at 2)[9]

---

[8]  Defense counsel contends that this testimony should be ignored because (1) "Contreras was simply struggling to understand the Government's opaque inquiry"; and (2) the interpreter's translation was not clear.  (Def. Post-Hrg. Br. (Dkt. No. 45) at 8 & n.2)  The Government's question was not "opaque," however, and it was repeated to ensure that Contreras understood the question.  And while the Government posed a hypothetical question, defense counsel asked Contreras a series of hypothetical questions.  See, e.g., Feb. 23, 2023 Tr. (Dkt. No. 40) at 44-45, 63.  As to counsel's suggestion of translator error, there is no evidence that the translator misinterpreted these questions and the Defendant's answers.  In sum, this exchange will be considered along with all of the other testimony.

[9]  Contreras testified that another inmate wrote the letter for him, and that Contreras signed it. (Feb. 23, 2023 Tr. (Dkt. No. 40) at 57-58)  Although the letter does not reflect an addressee, the parties describe the letter in their joint submission of exhibits as a "letter of Hairo Contreras to ICE."  (May 5, 2023 Joint Ltr. (Dkt. No. 47) at 1)

Contreras was released from New York State prison to ICE custody on October 2, 2019, and he was deported on November 5, 2019.  (N.Y. Criminal History, GX-2 (Dkt. No. 47-21) at 6; ICE Removal Worksheet, DX-M (Dkt. No. 47-12) at 2)

      **J.**      **Defendant's Reentry into the United States**

At some time before January 28, 2021, Defendant reentered the United States "without having obtained the express consent of the Attorney General of the United States or his successor, the Secretary for the Department of Homeland Security, to reapply for admission." (Indictment (Dkt. No. 6) at 1-2)

**II.**      **PROCEDURAL HISTORY**

The Criminal Complaint was filed on March 17, 2021 (Dkt. No. 1), and Defendant was arrested on January 28, 2022.  (Bail Sheet (Dkt. No. 4))  The Indictment was filed on March 1, 2022, and charges Contreras with illegal reentry in violation of 8 U.S.C. §§ 1326(a) and (b)(2).  (Dkt. No. 6)

Defendant moved to dismiss the Indictment or, in the alternative, for an evidentiary hearing, on August 19, 2022.  (Def. Mot. (Dkt. No. 18))  The evidentiary hearing was conducted on February 23, 2023.  (Feb. 23, 2023 Tr. (Dkt. No. 40))  The parties submitted post-hearing briefs.  (Def. Post-Hrg. Br. (Dkt. No. 42); Govt. Post-Hrg. Opp. (Dkt. No. 44); Def. Post-Hrg. Reply Br. (Dkt. No. 45))

**DISCUSSION**

**I.**      **WHETHER DEFENDANT'S DEPORTATION ORDER IS INVALID**

Contreras contends that – because the Federal and New York State definitions of "cocaine" differ, his New York State conviction for selling cocaine does not make him an "aggravated felon" for purposes of the voluntary departure statute, and that he was eligible for voluntary departure.  Contreras goes on to argue that the immigration judge committed

prejudicial error by not informing him of his right to seek voluntary departure, and that he was

deprived of his due process rights in the removal proceedings.  He further argues that his waiver

of his right to appeal to the BIA was not knowing and intelligent, and that he did not have a

realistic opportunity to appeal the deportation order to an Article III court.  For these reasons,

Contreras argues that his deportation cannot be a predicate for a subsequent charge of illegal

reentry.  (See Def. Br. (Dkt. No. 19))

### A.     Legal Standard

Section 1326(d) of Title 8 permits an alien charged with illegal reentry under 8
U.S.C. § 1326(a) to challenge the underlying deportation order on which the
illegal reentry charge is based.  This provision effectively codified the Supreme
Court's decision in United States v. Mendoza-Lopez, 481 U.S. 828 (1987).  In
Mendoza–Lopez, the Supreme Court held that an alien charged with illegal
reentry must have the opportunity to challenge his or her deportation order if
those proceedings violated the alien's rights.  481 U.S. at 838-39. . . .

In order to successfully challenge a deportation order under § 1326(d), an alien
must demonstrate that:

> "(1) the alien exhausted any administrative remedies that may have been
> available to seek relief against the order;
>
> (2) the deportation proceedings at which the order was issued improperly
> deprived the alien of the opportunity for judicial review; and
>
> (3) the entry of the order was fundamentally unfair."

United States v. Lopez, 445 F.3d 90, 94 (2d Cir. 2006) (quoting 8 U.S.C. § 1326(d); further

citations omitted).  "The requirements are connected by the conjunctive 'and,' meaning

defendants must meet all three."  United States v. Palomar-Santiago, 141 S. Ct. 1615, 1620–21

(2021).

In United States v. Copeland, 376 F.3d 61 (2d Cir. 2004), United States v.

Calderon, 391 F.3d 370 (2d Cir. 2004), and United States v. Sosa, 387 F.3d 131 (2d Cir. 2004),

the Second Circuit sets out the standard for challenging an underlying deportation order under

Section 1326(d).  In these cases, the court instructs that (1) "'[a] failure to advise a potential

deportee of a right to seek [discretionary relief from deportation] can, if prejudicial, be

fundamentally unfair within the meaning of Section 1326(d)(3),'" Calderon, 391 F.3d at 376

(quoting Copeland, 376 F.3d at 71); (2) an immigration judge's failure to inform the potential

deportee of a right excuses the potential deportee's failure to exhaust administrative remedies

under Section 1326(d)(1), because "'a failure to exhaust administrative remedies bars collateral

review of a deportation proceeding under Section 1326(d)(1) only when an alien's waiver of

administrative review was knowing and intelligent,'" id. at 374-75 (quoting Sosa, 387 F.3d at

136) (cleaned up); and (3) there is no "realistic opportunity for judicial review" under Section

1326(d)(2) where the "waiver of the right to appeal is not knowing" due to the deportee being

misinformed, and where "the interval between entry of the final deportation order and the

physical deportation is too brief to afford a realistic possibility of filing a habeas petition."

Copeland, 376 F.3d at 68 & n.6; accord Sosa, 387 F.3d at 137-38.[10]

---

[10]  The Government argues that Copeland, Calderon, and Sosa are no longer good law in light of
United States v. Palomar-Santiago, 141 S. Ct. 1615 (2021).  Palomar-Santiago overturned the
Ninth Circuit's "excusal rule" as set forth in United States v. Ochoa, 861 F.3d 1010 (9th Cir.
2017).  See Ochoa, 861 F.3d at 1015 ("[U]nder our circuit's law, if Defendant was not convicted
of an offense that made him removable under the INA to begin with, he is excused from proving
the first two requirements [of administrative exhaustion and deprivation of the opportunity for
judicial review]."); Palomar-Santiago, 141 S. Ct. at 1620 ("The Ninth Circuit's interpretation is
incompatible with the text of § 1326(d).").  The Government contends that Palomar-Santiago
overturned the Copeland, Calderon, and Sosa line of cases as well because "the Ninth Circuit's
rule creating an exception to Section 1326(d)(1)&(2)'s requirement [was] essentially the same as
that in the Second Circuit."  (Govt. Opp. (Dkt. No. 23) at 21)  "[B]ecause Palomar-Santiago did
not expressly abrogate Sosa," however, "this Court is bound by Sosa until such time that it is
revisited by the Second Circuit or the Supreme Court.  It is not the job of a district court to
overrule decisions by its court of appeals."  United States v. Juan Guzman, No. 1:19-CR-435-
GHW, 2022 WL 17068800, at *6 n.1 (S.D.N.Y. Nov. 17, 2022) (citing United States v. Peguero,
34 F.4th 143, 158-59 (2d Cir. 2022)); see also Gutierrez-Campos, 2022 WL 281582, at *19
("[T]he Second Circuit in Sosa and related decisions . . . recognized that while the requirements
under section 1326(d) are mandatory as a statutory matter, the statutory exhaustion requirement

### B.     Whether the Removal Proceeding Was Fundamentally Unfair

"[S]ection 1326(d)(3) requires [a defendant challenging a deportation order] to demonstrate that the deportation proceeding was fundamentally unfair. . . . This provision requires a showing of 'both a fundamental procedural error and prejudice resulting from that error.'"  Calderon, 391 F.3d at 376 (quoting United States v. Perez, 330 F.3d 97, 104 (2d Cir. 2003)).  "The alien bears the burden of showing that entry of the removal order was fundamentally unfair."  United States v. Daley, 702 F.3d 96, 100 (2d Cir. 2012).

#### 1.     Whether There Was a Fundamental Procedural Error

##### a.     Whether an Immigration Judge Must Inform an Eligible Alien of the Right to Voluntary Departure

At the November 18, 2022 conference in this case, this Court stated that it had "conclude[d], for the reasons explained by Judge Cronan [in Gutierrez-Campos] and other judges in this [D]istrict . . . that 'an immigration judge's failure to inform an eligible noncitizen of the availability of voluntary departure can constitute a fundamental procedural error'" under the standard set forth in Copeland, Calderon, and Sosa.  (Nov. 18, 2022 Tr. (Dkt. No. 31) at 9 (quoting Gutierrez-Campos, 2022 WL 281582, at *11))  This Court will not revisit that finding, and now adopts it as a holding.  See Juan Guzman, 2022 WL 17068800, at *3; United States v. Brown, 354 F. Supp. 3d 362, 369 (S.D.N.Y. 2018) ("[A] failure to advise of the right to seek relief through voluntary departure is a fundamental error."); United States v. Leopoldo Guzman, No. 1:18-CR-216-GHW, 2018 WL 3443158, at *4 (S.D.N.Y. July 17, 2018) ("The immigration

---

may be excused as a constitutional matter where the noncitizen's waiver of appeal was not knowing and intelligent.  Because the Supreme Court's holding in Palomar-Santiago was limited to statutory construction and did not address the constitutional concerns implicated in Sosa and other Second Circuit cases, Second Circuit precedent excusing the exhaustion requirement under section 1326(d)(1) where the waiver was not knowing and intelligent remains good law.") (emphases in original).

judge's failure to inform [the defendant] of the availability of voluntary departure was a

fundamental procedural error."); Gonzalez, 2015 WL 3443942, at *1 ("the failure to inform an

alien about the right to seek voluntary departure does indeed qualify as fundamental error if the

alien shows that he was prejudiced by the error"; granting motion to dismiss illegal reentry

charge).[11]

> **b.     Whether Defendant Was Eligible for Voluntary Departure**

> In assessing whether a state conviction qualifies as an "aggravated felony" under
> the [Immigration and Nationality Act ("INA")], courts employ a "categorical
> approach" to determine "whether the state offense is comparable to an offense
> listed in the INA."  Under the categorical approach, courts identify "the minimum
> criminal conduct necessary for conviction under a particular statute by looking
> only to the statutory definitions – i.e., the elements – of the offense, and not to the
> particular underlying facts."  In other words, "[i]f the state statute criminalizes
> conduct that the federal offense does not, the two are not categorical matches and
> a conviction under the state statute cannot serve as a predicate for removal under
> the INA."

Gutierrez-Campos, 2022 WL 281582, at *12 (citing and quoting Moncrieffe v. Holder, 569 U.S.

184, 190 (2013); Mellouli v. Lynch, 575 U.S. 798, 806 (2015); Hylton v. Sessions, 897 F.3d 57,

60 (2d Cir. 2018); and Williams v. Barr, 960 F.3d 68, 72 (2d Cir. 2020)) (emphasis in Gutierrez-

Campos).

The Second Circuit has recently reaffirmed the use of the categorical approach in

determining whether a state drug conviction can serve as a predicate for a Federal law

determination.  See United States v. Gibson, 60 F.4th 720 (2d Cir. 2023) (per curiam) (applying

---

[11]  While adopting the holding in Gutierrez-Campos, this Court rejects that part of the analysis
stating that "the relevant regulation provide[s] that the immigration judge had a duty to inform a
noncitizen of potential forms of relief [for] which he or she is eligible, including voluntary
departure."  Gutierrez-Campos, 2022 WL 281582, at *11.  The regulation cited in Gutierrez-
Campos – 8 C.F.R. § 1240.11(a)(2) –  applies only "in conjunction with an[] application for
creation of status of an alien lawfully admitted for permanent residence."  That provision does
not apply to all removal proceedings.

the categorical approach; holding that, because the "opium alkaloid derivative" naloxegol had

been removed from the Federal controlled substances schedule but not from the New York State

controlled substances schedule, the New York schedule was "categorically narrower than the

New York drug schedules," and, therefore, the defendant's New York State narcotics conviction

could not serve as the basis for a finding that the defendant was a "career offender" under the

U.S. Sentencing Guidelines), adhering on reh'g to 55 F.4th 153 (2d Cir. 2022).

       As relevant here, N.Y. Penal Law § 220.41(1) – the statute that Contreras was

convicted of violating in March 2018 – provides that "[a] person is guilty of criminal sale of a

controlled substance in the second degree when he knowingly and unlawfully sells . . . one or

more preparations, compounds, mixtures or substances containing a narcotic drug and the

preparations, compounds, mixtures or substances are of an aggregate weight of one-half ounce or

more."

       New York defines "narcotic drug" as including the following:

> Coca leaves and any salt, compound, derivative, or preparation of coca leaves,
> and any salt, compound, derivative, or preparation thereof which is chemically
> equivalent or identical with any of these substances including cocaine and
> ecgonine, their salts, isomers, and salts of isomers . . . .

N.Y. Pub. Health L. § 3306, Schedule II(b)(4).

       The Federal Controlled Substances Act (the "CSA") provides a similar definition

of cocaine:

> Coca leaves . . . and any salt, compound, derivative or preparation of coca leaves
> (including cocaine . . . and ecgonine . . . and their salts, isomers, derivatives and
> salts of isomers and derivatives), and any salt, compound, derivative, or
> preparation thereof which is chemically equivalent or identical with any of these
> substances . . . .

21 C.F.R. § 1308.12(b)(4).

However, a Federal regulation defines the term "isomer" – as used in Section

1308.12(b)(4) – as including "any optical or geometric isomer."  21 C.F.R. § 1300.01(b).

> Isomers are "[c]hemical compounds that have the same composition but differ in
> the chemical arrangement of their constituents."  There are various types of
> isomers; the federal definition, however, extends only to "optical or geometric"
> isomers of cocaine.  The New York definition, in contrast, does not limit the type
> of isomers that fall within its definition of cocaine.  Rather, by its terms, New
> York's definition of cocaine covers isomers of cocaine other than optical and
> geometric, including positional isomers and other isomers.

Gutierrez-Campos, 2022 WL 281582, at *13 (quoting Merck Eprova AG v. Gnosis S.p.A, 760

F.3d 247, 252 (2d Cir. 2014); citing United States v. Fernandez-Taveras, 511 F. Supp. 3d 367,

373 (E.D.N.Y. 2021)).

Because of this definitional difference between the New York and Federal

controlled substances schedules, Contreras argues that "New York's definition of 'narcotic

drug,' under Mr. Contreras's statute of conviction, was broader than the federal definition."  As a

result, Contreras was "not convicted of an 'aggravated felony'" within the meaning of the

Immigration and Naturalization Act ("INA"), and the immigration judge "therefore should have

advised him he was eligible for voluntary departure."  (Def. Br. (Dkt. No. 19) at 17 (citing 8

U.S.C. § 1227(a)(2)(B)(i)))

As this Court stated at the November 18, 2022 conference, "[i]n another case . . .

[this Court] accepted th[e] argument [regarding the different isomers of cocaine in the New York

and Federal schedules], noting that many other courts have reached the same decision."  This

Court further noted that it "do[es] not intend to revisit that determination here."  (Nov. 18, 2022

Tr. (Dkt. No. 31) at 9 (citing United States v. Lawrence, 21 Cr. 127 (PGG), Sentencing Tr. (Dkt.

No. 54) (S.D.N.Y. Aug. 18, 2022)))

Because Defendant's 2018 New York State conviction for criminal sale of a

controlled substance was pursuant to a controlled substances schedule that is categorically

narrower than its Federal counterpart, the conviction cannot be construed as a conviction for sale of a controlled substance for purposes of Federal law.  Accordingly, Defendant's New York State conviction for criminal sale of a controlled substance did not make him an "aggravated felon" under the INA, and he was therefore eligible for voluntary departure.[12]

*       *       *       *

In sum, this Court holds that (1) Contreras had not committed an "aggravated felony," and thus was eligible for voluntary departure; and (2) the immigration judge committed a fundamental error in not advising Contreras of his right to apply for voluntary departure.

### 2.       Whether the Immigration Judge's Error Caused Prejudice

"[I]n order to demonstrate prejudice, an alien must show that his proceeding contained errors so fundamental that he might have been deported in error.  [The Second Circuit] ha[s] adopted the same test for prejudice as used to decide claims of ineffective assistance of counsel:  'Prejudice is shown where 'there is a reasonable probability that, but for the error, the result of the proceeding would have been different.'"  Daley, 702 F.3d at 100 (quoting Copeland, 376 F.3d at 73) (further quotation omitted).

Accordingly, "[t]o show prejudice [here], [Contreras] must demonstrate a reasonable probability that, but for the [immigration judge's] failure to advise him of the availability of applying for voluntary departure, he would have sought voluntary departure and would have been granted such relief."  Gutierrez-Campos, 2022 WL 281582, at *16.

---

[12]  The Government does not dispute that Contreras satisfied the other eligibility requirements for voluntary departure:  he was not alleged to be a terrorist; he had not previously been deported or granted voluntary departure; he had no pending requests for other relief from deportation; he conceded removability; and he waived appeal.  See 8 U.S.C. § 1229c(c); 8 C.F.R. § 1240.26(b).

a.     __Voluntary Departure and the Early Parole Program__

Under the Early Parole Program, immediate parole from New York State prison is available only to an inmate who "has had a final order of deportation issued against him."  N.Y. Exec. L. § 259-i(2)(d)(i).  "The difference between parole and [the Early Parole Program] is that the latter requires, as a condition of its granting, that the inmate actually be deported. Consequently, if an inmate were granted [early parole], and he then successfully challenged his final order of removal, or if he could not be deported for some other reason, the Parole Board could re-take him into state custody."  Borrell v. Superintendent of Wende Corr. Facility, No. 12-CV-6582 CJS MWP, 2014 WL 297345, at *10 (W.D.N.Y. Jan. 27, 2014) (emphasis in original). In sum, the Early Parole Program "is contingent on [ICE] accepting custody and deporting the prisoner," Duamutef v. I.N.S. ("Duamutef I"), No. CIV.A. CV-02-1345, 2003 WL 21087984, at *4 (E.D.N.Y. May 14, 2003), and voluntary departure and New York's Early Parole Program are mutually exclusive.

Accordingly, had Contreras sought – and been granted – voluntary departure, he could not have participated in the Early Parole Program, and he would have been required to serve his three-year sentence in New York State prison.  But because of (1) Contreras's participation in the Early Parole Program; and (2) the immigration judge's entry of a final order of removal, Contreras was released from New York State prison into ICE custody in October 2019.  (N.Y. Criminal History, GX-2 (Dkt. No. 47-21) at 6)

The parties have not cited – and this Court has not found – any other case involving an alien who (1) obtained early release pursuant to the Early Parole Program; (2) was deported; (3) illegally returned to the United States and was apprehended; and (4) then challenged his deportation order as invalid because the immigration judge did not advise the defendant of his right to seek voluntary departure.  As this Court stated at the November 18,

2022 conference, "[t]hese circumstances present a significant factual issue as to whether Contreras would in fact have agreed to serve his three-year sentence for the mere hope of (1) being granted voluntary departure; and (2) being later readmitted to the United States, despite his criminal record, which included a conviction for criminal sale of a controlled substance."  (Nov. 18, 2022 Tr. (Dkt. No. 31) at 12)

Defendant states in his declaration that, "[i]f [he] had known voluntary departure was an option, [he] would have requested it, even if it meant serving [his] complete prison sentence, because it would have provided a way for [him] to live legally with [his] family in New York."  (Contreras Decl. (Dkt. No. 20-1) ¶ 14)  But because the issue of prejudice turns on Contreras's state of mind in 2018, this Court decided to "hear[] evidence . . . on the issue of whether – given the benefit Mr. Contreras received from the [E]arly [P]arole [P]rogram – there is a reasonable probability that, but for the immigration judge's failure to advise him of the availability of applying for voluntary departure, he would have sought voluntary departure. . . ."  (Feb. 23, 2023 Tr. (Dkt. No. 40) at 3 (quotation and brackets omitted))

**b.    Whether Defendant Would Have Sought Voluntary Departure at the Cost of Forgoing Early Parole**

Contreras was the sole witness at the evidentiary hearing.  He was not a credible witness.

As discussed above, in December 2017, Defendant's wife contacted immigration attorney Mondello's law firm and spoke with Mondello's associate, Pablo Forray.  In an email to Mondello summarizing the call, Forray states:  "I told her that a drug charge would complicate his U-visa petition, but that we couldn't tell until we knew more.  I also told her that he needs to consult with an immigration attorney like us before pleading to anything."  (Dec. 13, 2017 Forray Email, DX-A (Dkt. No. 47-1) at 2)  Consistent with Forray's email reporting to Mondello

that he did not tell Contreras's wife that the U-visa was a lost cause, Forray's time sheets reflect time spent on researching the effect of Contreras's recent arrest on his U-visa application. (Forray Time Sheets, DX-B (Dkt. No. 47-2) at 2)

Contreras testified, however, that his wife – after consulting Forray – told Contreras that he "had no . . . chances whatsoever anymore" with respect to his U-visa application.  He further testified that she did not tell him that Forray had advised her to tell Contreras to consult with an immigration attorney before pleading guilty.  (Feb. 23, 2023 Tr. (Dkt. No. 40) at 23, 51)

Contreras's testimony on these points is not credible.  We know from Forray's contemporaneous email that he did not tell Contreras's wife that Contreras "had no . . . chances whatsoever anymore" with respect to his U-visa application.  And it is likewise completely implausible that Contreras's wife did not pass on Forray's advice that Contreras speak with an immigration lawyer before pleading guilty.

While Contreras's testimony on these points does not go to whether there is a "reasonable likelihood" that he would have pursued voluntary departure, this testimony does bear on his overall credibility.

As to whether there is a "reasonable likelihood" that if Contreras had been advised of voluntary departure, he would have applied for that relief, chosen to serve his three-year sentence, and not sought early parole, Contreras so testified during his direct examination:

Q. Mr. Contreras, if you had been told back in 2018 that voluntary departure meant that you would potentially be able to come back to the United States legally one day, would you have pursued that as an option?

A. Yes.

Q. Even though you would have had to serve your entire prison sentence?

A. Yes.

Q. And even though you would have had to go back to the Dominican Republic anyway?

A. Yes.

Q. And even if you had been told that there was no guarantee you could come back to the United States legally?

A. Yes.

Q. Why would you have pursued that option instead of early conditional deportation?

A. Because with that option of voluntary deportation, that would be the hope of one day being able to come back to the United States, legally.

Q. Why was that important to you?

A. Because here I can offer a better way of life to my children, my wife, my family, and because this is the safest country.

(Feb. 23, 2023 Tr. (Dkt. No. 40) at 44-45)

Contreras's testimony on cross-examination was more equivocal. On cross, Contreras admitted that whether he would have pursued voluntary departure – and chosen to serve his three-year state sentence and given up early parole – would have depended on the likelihood of being granted voluntary departure:

Q. Mr. Contreras, if you were told in 2018 that it was unlikely you would receive voluntary departure, would you have chosen to serve your entire three-year sentence?

A. Correct.

Q. That's a yes, you would have served your entire three-year sentence?

A. What you are saying is – could you repeat the question?

Q. Sure.  If you had been told in 2018 that it was unlikely that you would receive voluntary departure, would you have dropped your request for early parole or deportation and chosen to serve your whole sentence?

A. No, I would have kept looking for deportation.

(Feb. 23, 2023 Tr. (Dkt. No. 40) at 60-61)

Moreover, at the hearing, Contreras was reluctant to admit that (1) his interest in the Early Parole Program was driven by his desire to be released from prison; and (2) he wanted to participate in the Early Parole Program even though he understood that – if he participated in that program – he would never be permitted to reenter the United States:

> THE COURT:  And even after you learned that if you participated in the [E]arly [Parole] [P]rogram you would never be allowed to return to the United States, you were still interested in participating in the [E]arly [Parole] [P]rogram[?]
>
> THE WITNESS:  At that time that was all I was interested in because that was the only option that I had.
>
> . . . .
>
> THE COURT:  And why was it that you were still interested in the [E]arly [Parole] [P]rogram even after you were told that if you participated in that program, you could never come back to the United States?
>
> THE WITNESS:  Because as I understood it, that was the only option I had at the time.
>
> THE COURT:  I don't understand what you're saying.  What I'm trying to understand is, you told us that you were told that if you took advantage of this [E]arly [Parole] [P]rogram, you could never return to the United States.  And you've also told us that even after you learned that, you were still interested in the program.  And I'm trying to understand why you were still interested in the program even after being told that.
>
> THE WITNESS:  Because they explained to me that whether I was in the early deportation or not, no matter what, I was going to be deported.
>
> THE COURT:  No, you've said that a number of times, that you understood that you were going to be deported.  You told us, no matter what.  I understand that.  But isn't it a fact that you remained interested in the [E]arly [Parole] [P]rogram, even after you were told you'd never be able to come back to the United States if you participated in the program, because you would get out of the three-year prison sentence?
>
> THE WITNESS:  Yes, that's right.  But I remained interested because if I served my whole sentence or got out early, it was all going to be the same for me; I'd never be able to return.
>
> THE COURT:  And this program offered you a way that you could avoid serving those three years in prison, didn't it?

THE WITNESS: Yes.

(Id. at 32-34)  Contreras would not admit the obvious benefit that he had received – relief from his three-year prison sentence – until the Court asked him a direct question on that point.

There is reason to doubt Contreras's current assertion that he would have given up early parole and chosen to serve his three-year sentence in exchange for the mere possibility of obtaining voluntary departure and the mere chance of being granted legal re-entry to the United States, despite his criminal record.

As an initial matter, Contreras has chosen to enter this country and remain here illegally on multiple occasions.  He has not previously demonstrated any interest in seeking lawful entry into the United States.[13]

Moreover, after his most recent drug trafficking arrest, Contreras never sought any information concerning lawful admission to the United States.  Contreras's sole focus was on obtaining early parole from prison, despite his understanding that participation in the Early Parole Program would prevent him from every lawfully reentering the United States.

As discussed above, Contreras learned about the Early Parole Program from other inmates at Rikers Island, after his most recent drug trafficking arrest.  (Feb. 23, 2023 Tr. (Dkt. No. 40) at 28)  A week after entering the state prison system, he told an ICE officer that he "wish[ed] to be deported from the U.S. as soon as possible."  (Apr. 13, 2018 ICE Affidavit, DX-Q (Dkt. No. 47-16) at 6)  Defendant then wrote to ICE, stating that he "want[ed] to wa[i]ve all of [his] right[s] to a deportation hearing [and] appeal and have [his] removal order issue[d] against [him] as soon as possible. . . . so that [he could] be granted an order for Early Conditional Parole

---

[13]  And while Contreras began the process for obtaining a U-visa, he didn't pursue that process through completion.

for Deportation Only."  (Aug. 18, 2018 Contreras Ltr., DX-S (Dkt. No. 47-17) at 2)  And when

Contreras appeared at his removal hearing, he told the immigration judge that he "want[ed] to be

deported."  (Oct. 3, 2018 Removal Proceeding Audio, DX-L (Dkt. No. 47-11))  Finally, after the

order of removal was issued, and impatient that he had not yet been released from state prison,

Contreras sent a letter to ICE asking "why [he was] still in prison instead of being in . . . federal

lock-up to await []his deportation."  (Aug. 28, 2019 Contreras Ltr., DX-T (Dkt. No. 47-18) at 2)

        While Contreras took many steps to pursue early parole, there is no evidence that

he ever inquired about how he could legally return to the United States following deportation.

When asked at the evidentiary hearing if "any lawyer ever sp[oke] to [him] about [his] ability to

come back to the United States legally," Contreras answered "No."  (Feb. 23, 2023 Tr. (Dkt. No.

40) at 35)  Consistent with this testimony, there is no evidence in the record suggesting that

Contreras ever asked a lawyer about whether he could lawfully return to the United States after

his deportation.  While Contreras testified that his wife had asked certain unidentified

"immigration lawyers" about this issue, and that they had told her that Contreras was "not going

to be able to return to the United States legally" (id. at 36; see id. at 32 ("[T]he lawyers that my

wife went to check with, they told her that.")), neither the Defendant's wife nor the immigration

lawyers she allegedly consulted testified at the evidentiary hearing.  Given that the parties

stipulated that Contreras's immigration lawyer Mondello and Mondello's associate Forray would

– if called as witnesses – "testify that [they did] not recall having any additional discussions with

[Contreras] or his family members [after the December 2017 phone call in which Forray

discussed the effect of Contreras' recent drug arrest on his U-visa application]" (Mondello Stip.,

DX-U (Dkt. No. 47-19) ¶¶ 4(g), 5-6), it is entirely unclear what immigration lawyers Contreras's

wife consulted.  Finally, Contreras tirelessly pursued the Early Parole Program even though he

understood that participation in the program would prohibit him from every lawfully returning to the United States.  (Feb. 23, 2023 Tr. (Dkt. No. 40) at 31)

Given this evidentiary record, Contreras has not carried his burden to demonstrate that there is a "reasonable probability" that – had the immigration judge informed him of the voluntary departure program – Contreras would have chosen to serve his three-year state sentence and waived his early parole opportunity.  Having obtained the benefit from the Early Parole Program, Contreras now downplays the significance of that benefit.  Other than Contreras's self-serving testimony, however, there is no evidence that he would have forgone the opportunity for immediate release from state prison in exchange for the possibility – post-deportation – that the United States would admit him despite his serious criminal record.  And while Contreras resisted even acknowledging at the hearing that his interest in the Early Parole Program was driven by a desire to be released from state prison, that objective was his sole focus at the time.  Accordingly, the Court concludes that if the immigration judge had informed Contreras at the removal proceeding that he had a right to apply for voluntary departure, that would not have altered his decision to seek release from state prison pursuant to the Early Parole Program – an objective he had already pursued for months.

Because Contreras has not shown a reasonable probability that, if he had been informed of his eligibility for voluntary departure, he would have pursued it, he has not shown that he suffered prejudice as a result of the immigration judge's failure to inform him of this right.  Because Contreras has not shown prejudice, he has not demonstrated fundamental unfairness under 8 U.S.C. § 1326(d)(3) or that his deportation was invalid.

## II.   WHETHER SECTION 1326 VIOLATES
##        <u>DEFENDANT'S EQUAL PROTECTION RIGHTS</u>

Citing the disparate impact analysis set forth in <u>Village of Arlington Heights v.</u>

<u>Metropolitan Housing Development Corp.</u>, 429 U.S. 252 (1977), Contreras argues that the illegal

reentry statute codified at 8 U.S.C. § 1326 violates the equal protection guarantee of the Fifth

Amendment.  Accordingly, the Indictment must be dismissed.[14]

### A.   <u>Legal Standard</u>[15]

A facially neutral statute can violate equal protection principles if it both has a racially disparate impact, and the legislative body was motivated to enact the statute at least in part by racism.  The Government does not contest Defendant's argument that Section 1326 has disparately impacted Hispanic peoples, but rather submits that Defendant has failed to show that Congress was motivated to enact Section 1326 based on racial animus.  In order to determine "whether invidious discriminatory purpose was a motivating factor" for the enactment of Section 1326, Courts conduct a "sensitive inquiry" into a variety of factors including the "impact of the official action" and whether it "bears more heavily on one race than another"; the "historical background of the decision"; the "specific sequence of events leading up to the challenged decision"; "[d]epartures from the normal procedural sequence"; and the "legislative or administrative history."

<u>United States v. Santos-Reynoso</u>, No. 21-CR-268-LTS, 2022 WL 2274470, at *2 (S.D.N.Y. June

23, 2022) (quoting <u>Arlington Heights</u>, 429 U.S. at 266-68) (brackets in <u>Santos-Reynoso</u>; further

quotations and citations omitted).

---

[14]  While <u>Arlington Heights</u> is a Fourteenth Amendment case, the Supreme Court has held that the same equal protection rights protected by the Fourteenth Amendment are "implicit in the Fifth Amendment's Due Process Clause."  <u>Sessions v. Morales-Santana</u>, 582 U.S. 47, 52 n.1 (2017).

[15]  The Government argues that "[a]s an immigration law, Section 1326 is subject to rational basis review when challenged on constitutional grounds."  (Govt. Opp. (Dkt. No. 23) at 10)  This Court does not reach that issue, because it finds that Defendant has not satisfied the less stringent <u>Arlington Heights</u> standard.  <u>See Santos-Reynoso</u>, 2022 WL 2274470, at *6.

B.      <u>Analysis</u>

Contreras argues that (1) "racism was not just a motivating factor in enacting [the Undesirable Aliens Act of 1929, which included the first felony reentry provision], but was the primary factor"; (2) "[t]he 1952 []enactment [of the INA, which includes Section 1326] . . . was still motivated by discriminatory intent, and Congress did nothing to 'cleanse' Section 1326 of its racist origins"; (3) "[the affidavit of] Professor [S. Deborah] Kang further demonstrates that revisions to § 1326 in 1988, 1990, 1994 and 1996 . . . were likewise motivated by animus against Latin American immigrants"; and (4) "Section 1326 disparately – indeed virtually exclusively – affects Latinos."  (Def. Br. (Dkt. No. 19) at 25-32 (quotations omitted))

Contreras urges this Court to follow <u>United States v. Carrillo-Lopez</u>, 555 F. Supp. 3d 996 (D. Nev. 2021), in which an illegal reentry charge was dismissed on equal protection grounds.  (Def. Br. (Dkt. No. 19) at 32)  "Since the <u>Carrillo-Lopez</u> decision," however, "dozens of other courts across the country have considered <u>Arlington Heights</u> challenges to § 1326, and each one of them has upheld the provision."  <u>United States v. Patterson</u>, No. 3:21-CR-103 (VAB), 2023 WL 348970, at *4 (D. Conn. Jan. 20, 2023); <u>see</u> <u>United States v. Barcenas-Rumualdo</u>, 53 F.4th 859, 865 n.15 (5th Cir. 2022) (listing cases; affirming denial of motion to dismiss).  In doing so, many courts considered and rejected the same affidavits submitted in support of Contreras's motion to dismiss.  <u>See, e.g.</u>, <u>United States v. Maldonado-Guzman</u>, No. 21 CR 448 (CM), 2022 WL 2704036, at *3 (S.D.N.Y. July 12, 2022); <u>Santos-Reynoso</u>, 2022 WL 2274470, at *3-5; <u>United States v. Crespo-Castelan</u>, No. 22 CR. 009 (JFK), 2022 WL 2237574, at *2 n.1 (S.D.N.Y. June 22, 2022); <u>United States v. Jimenez Joachin</u>, No. CR 22-10101-NMG, 2022 WL 17736798, at *4 (D. Mass. Dec. 16, 2022); <u>United States v. Vera</u>, No. 1:22-CR-00043-JL, 2022 WL 3716503, at *2 (D.N.H. Aug. 29, 2022); <u>United States v. Ramirez-Aleman</u>, No. 21CR3403-BEN, 2022 WL 1271139, at *5 (S.D. Cal. Apr. 27, 2022); <u>United States v.</u>

Hernandez-Lopez, 583 F. Supp. 3d 815, 819–21 (S.D. Tex. 2022); United States v. Sifuentes-Felix, No. 21-CR-337-WJM, 2022 WL 293228, at *2 n.3 (D. Colo. Feb. 1, 2022).

        Five courts in this Circuit have rejected Arlington Heights challenges to Section 1326.  These courts found that – while there is substantial evidence that (1) nativism and racism animated many of the legislators who enacted the Undesirable Aliens Act of 1929, and (2) certain legislators made racist statements when the INA was enacted in 1952 – there is little to no evidence that Section 1326 itself – which was enacted in 1952 and subsequently reenacted numerous times – was motivated by racism.  See Santos-Reynoso, 2022 WL 2274470, at *6 ("[E]ven assuming Section 1326 has had a disparate impact on Latinos since its inception, the Court finds that Defendant's evidentiary proffers, which focus largely on the context of immigration issues and attitudes in the larger time period, are insufficient to establish under the Arlington Heights standard that discriminatory animus toward Hispanic peoples was a motivating factor in the enactment of Section 1326.") (quotation omitted); Maldonado-Guzman, 2022 WL 2704036, at *4 ("Although the statements made by a handful of legislators around the time period of the INA's passage are deeply disturbing, the Court recognizes that these statements were not made about § 1326 specifically, and cannot be used to ascribe intent to the other hundreds of members of Congress.") (quotation omitted); Crespo-Castelan, 2022 WL 2237574, at *4 ("[T]he Court concludes that [defendant] has failed to demonstrate that racial animus was a motivating factor behind the enactment of 8 U.S.C. § 1326."); United States v. Suquilanda, No. 21 CR 263 (VM), 2021 WL 4895956, at *5 (S.D.N.Y. Oct. 20, 2021) ("[T]he vast majority of the evidence of racial animus and discriminatory intent focuses on the 1929 Undesirable Aliens Act, a precursor to the modern-day Section 1326, which was undoubtedly enacted in the face of bald racial animus towards Hispanic people.  But this evidence bears little

weight on Section 1326, which was officially reenacted as a felony offense in 1952 as part of the broader Immigration and Nationality Act.  Further, this provision has been modified a number of times since 1952 in order to enhance penalties or otherwise rebalance the deterrent effect of the law.") (citations omitted); Patterson, 2023 WL 348970, at *7 ("[T]he Court follows the reasoning of the vast majority of courts that have considered this evidence and concludes that it fails to establish that racial animus was a motivating factor behind the reenactment of § 1326.") (quotation omitted).

        For substantially the same reasons cited by other courts in this Circuit, this Court concludes that Defendant has not demonstrated that Section 1326 violates the equal protection guarantee of the Fifth Amendment.  Moreover, "[b]ecause the factual allegations upon which Defendant relies are insufficient to show that the statute at issue is unconstitutional, the Court concludes [that an evidentiary] hearing [is] unnecessary." Santos-Reynoso, 2022 WL 2274470, at *6.

## CONCLUSION

        For the reasons stated above, Defendant's motion (Dkt. No. 18) is denied in its entirety.  The Clerk of Court is directed to terminate the motion.

Dated: New York, New York
      May 17, 2023

                  SO ORDERED.

                  Paul G. Gardephe
                  United States District Judge